Thank you, Your Honors, and happy Thanksgiving. I would like to thank the Court for allowing me this opportunity to present my oral arguments. I represent the defendants' appellates in this matter. The District Court erred when denying defendants' motion for summary judgment because they are entitled to qualified immunity, as they did not violate a clearly established constitutional right beyond debate. Lewis points to no evidence that defendants delayed Lewis's dental care, but instead, Lewis received dental care within the constraints permitted by the unprecedented COVID-19 global pandemic, which restricted dental care to emergency dental services only and limited the available dental resources. Mr. Carney Slow down a second, but I thought the dental care was delayed. I thought that was the whole issue. Mr. Gutierrez No, well, actually, I contend that there's no fact that it was delayed, but if there was any delay here, it wasn't delay caused by the defendants. It was delay caused by the global pandemic. Mr. Carney Okay, but, I mean, the pandemic, you know, there are documents, there was guidance to the prison on what kinds of medical treatments, dental treatments could be delayed and what kinds should not be. It seemed like the facts construed in the light most favorable to the plaintiff here could indicate that he fell within the more, you know, acute needs that would need to be treated during the pandemic or at least the jury could conclude that. Mr. Gutierrez Well, Your Honor, if you go to the Friot case, though, in the instance of a global pandemic here, for example, in the Friot case, you have to give substantial deference and that's something that you cannot say, well, that's a question of fact, whether or not they're entitled to substantial deference. No, the Friot case says that they're entitled to substantial deference and that it's not the court's decision to determine post-act and said, oh, geez, you know, looking back on this, that we should just go forward and say, hey, you know, maybe there's a question of fact here, because if you do that, then you're going to have during these extreme emergencies. And I want to have the court recollect. I mean, there was nothing like the COVID-19 pandemic, at least in my lifetime. And if you go back and say, hey, I'm going to go back and say, OK, as the court and second guess or have some expert come back and second guess and say, hey, you could have done this or you could have done that and it would have been more effective, well, that's not how it works. I mean, because they have to be given discretion on how to do these things. In order to prove an Eighth Amendment violation, Lewis must establish that each individual defendant, OK, and that's a key here, Your Honor, is that it has to be, you have to look at each individual defendant. You can't look and say, oh, the dental care overall even here, because that's what they're doing. Mr. Davis, Mr. Davis, I do have a question, since you raised that point about each individual defendant. Specifically, I want to talk to you about Dr. Castellan. With regards to Dr. Castellan, at ER 250, Mr. Lewis's motion for summary judgment, he makes a very detailed argument that it was Defendant Castellan who treated him on March 19th, on July 1st, and on September 9th. And so Defendant at the time opposed summary judgment, argued that Gutierrez, Avila, and Nichols did not personally participate in the violation. But Defendant Castellan now contends that he was the treating physician on March 19th and 20th and on July 1st. So why didn't Castellan say so before the district court at summary judgment that he didn't participate? Well, no, Dr. Castellan, I don't know. My understanding of the facts are different from yours, and if I'm mistaken, I apologize, Your Honor. But my mistake is the only allegation really is that Dr. Castellan treated him on September 9th, and we're not disputing that, that Dr. Castellan treated him on September 9th. Right, but Mr. Lewis actually in his motion for summary judgment specifically articulates, and again, that's at ER 250, that he treated, that Mr. Castellan treated him on March 19th, July 7th, and on September 9th. But if you go actually, you can't go by the arguments in whatever he says in his motion for summary judgment. What you have to do is look at the underlying facts in the record. There is no evidence in the record that Dr. Castellan treated him on any date other than September 19th. Are you, do you, are you representing that? I mean, this is your client, so did Dr. Castellan treat him in March? I don't think, I don't see anything in the record that says he does, and I wasn't the counsel below him, and I couldn't find anything in the record that said that he treated him in March. Well, we know that he didn't argue that he wasn't personally treating him. We know he didn't argue that in front of the district court, did he? Your Honor, I can't say for certain one way or the other in that particular instance. Okay. Okay, and I apologize, Your Honor, for not being more prepared. How about with respect to the nurses? I mean, why were they not deliberately indifferent, or at least a jury could find that when they are getting all these different kites from Mr. Lewis that says he's in extreme pain? Because of the Peralta case, Your Honor. The Peralta case says, it was involving a chief dental, okay, these guys, these, these, they're only dental assistants. They're not dentists. They have no, no significant training in determining whether or not something would be a significant dental, dental condition. Okay? All they have is claims by Mr. Lewis that they haven't treated, that he needs dental care. Okay? I mean, isn't it undisputed that everybody knew he, he, I mean, as of from the very beginning, everybody knew this gentleman needed dental care. Your Honor, you're only speculating that. I don't know that I'm speculating. I think he was treated, I think he was treated for, for dental issues. There's no evidence in the record that they were ever, that they ever reviewed the dental records, that they ever, that they ever, that they ever participated in any of these dental appointments. There's no evidence in the record that they did anything. This is clearly under Peralta. Without any evidence that they actually were in any of these dental appointments, and that they actually participated in his dental treatment, there is no way they could possibly maybe suspect. That's a, maybe possibly they had a suspicion. But under Peralta it says, you know, inmates misrepresent things all the time. And so they cannot know from, from an inmate's claims about what the dental care is. The, the, the chief dental officer, he was a dentist even, and in Peralta. And they said, hey, guess what? You know what? We're not going to hold them liable based on complaints from inmates. Because inmates sometimes fabricate things, and often do. And so that can't do it. So under Farmer, even if you suspect, even if you have a suspicion that, that it is, that's not enough. You've got to have actual knowledge of, that he faced substantial, significant harm from this. Another thing is, is you've got to understand also, what could they do? They had no control over the dental resources. Dental resources were extremely limited during the COVID pandemic. They could only, they could only give appointments for days that the, that the dental providers were available. They can't say, hey, you can come into a dental appointment when there's no dentist available. There's nothing they could do. They had no control. So again, under Peralta, they cannot be possibly held liable for this, because they acted as reasonably as they could do. What they did is they, they took the kites and they scheduled them for the first available dental appointment that was available. What else do you want from the dental assistant, Your Honor? Okay. Do you want to save some time for rebuttal? Yes, Your Honor. Thank you very much. Okay. Thank you. Mr. Schneider? Good morning, and may it please the Court. Kyle Schneider on behalf of Isaac Lewis. The district court correctly held that a reasonable officer would have understood the three-and-a-half month delay in providing dental treatment for Mr. Lewis's serious medical need to be unlawful. Mr. Lewis suffered from tooth pain that his dentist determined in March at the start of the delay reflected a badly decayed tooth that, quote, needs further work. That's at ER 503. Let's just walk through the different defendants. I mean, start with the dental assistant. So the argument on the other side I hear is kind of two things. One, the pandemic. Two, the dental assistants are just dental assistants and they can't really be expected to do more. So why don't you address both those? Sure. I'm happy to, Your Honor. So as to COVID, Your Honor, I think it's very important to separate out in this interlocutory appeal from a denial of summary judgment, denial of qualified immunity, what are the undisputed facts about COVID versus the disputed facts. The undisputed facts about COVID, Your Honor, is, of course, COVID was going on during this time period, you know, and it's also undisputed that the facility had these COVID policies in place. But if you actually look at the NDOC's COVID policies about permissible treatments, and this is at ER 191 to 192, Your Honor, the COVID policies say that elective dental procedures should be delayed during this time period. But it goes on to say that urgent dental procedures, and it specifically singles out urgent dental procedures and it lists such as extraction could go forward during this time period. That's at ER 191 to 192. And so if you look at that, what we have here is Mr. Lewis's dentist in March told him that he had a tooth that was badly decayed, that he needed further work. Mr. Lewis in his kites says, you know, my doctor told me to come back for an extraction. That's at ER 489. And then when he's in fact seen at the end of the delay, he received an extraction. But counsel, what evidence do you have that Dr. Kassian was actually the treating dentist aside from the statements by Mr. Lewis? Sure, Your Honor. So one thing I would point to is exactly what Your Honor pointed to at ER 250, Mr. Lewis's summary judgment briefing below. And under this Court's precedence, Mr. Lewis's pro se below, this Court's precedence say that you should construe liberally pro se inmates' pleadings. And so I think that's one piece of evidence. But I think another piece of evidence we have, Your Honor, is that, you know, defendants said in their interrogatories that Dr. Kassian was one of the only one of only three dentists that was working at this facility during this time period. We know it's at ER 503 that it was the same dentist that was treating him on each of these dates. And so I think it's a... When you look at the chart notes, the chart notes from March, from July and from September seem to be by the same hand. You know, I think there's at least a plausible argument there. But is that going to be enough? That in addition to Mr. Lewis's statements? So I think it is, Your Honor. I mean, so again, this is coming up, this appeal is coming up on the denial of summary judgment. You're supposed to assume that all factual disputes have resolved in Mr. Lewis's favor and draw reasonable inferences in his favor. And so I think getting that standard, that is enough here to allow this claim to proceed to a factfinder. Of course, at trial, defendants could present evidence about Dr. Kassian's, about whether or not he was present there. But that's not a factual question. I mean, we're debating, like, the base-level question of whether he was even present to actually the claim is whether he was deliberately indifferent, he recklessly disregarded a known health risk. Like, what evidence is there of that? Sure, Your Honor. So I think in addition to his presence, if you look at the kites that were submitted, so there are a number of kites that were submitted throughout this time period. It's undisputed that Dr. or, sorry, I apologize, that Avila and Rodriguez Nicholson were reviewing those kites. But I think it's a reasonable inference to draw that Dr. Kassian would have also been consulted on these. So if you look at the Jett case, that's exactly, that's the inference that this Court draws. There, the inmate was submitting, you know, written requests for treatment and the like. And there, the defendants actually specifically denied that they'd even receive, and this included a doctor, they specifically denied that they'd even receive those. But the Court said at the summary judgment stage, we think it's a reasonable inference to draw that the doctors, you know, could have been made aware of this. What basis is there? I mean, just that this was, they all worked in the same dental office, so we're going to assume that? No, Your Honor. So I think that, I think a basis for this is that the NDOC's policies, and I apologize, I'm just looking for the page site here, this is the ER83 talks, the NDOC policies, specifically says that when dental kites are submitted, that doctors, that the doctors should review those and help to establish what the priority order is. And so I think based on that, and again, the inference that the Court drew in Jett, I think that's the basis for drawing the inference that Dr. Castiglione should have been, should have been aware of it, and thus was deliberately indifferent. What if, what if, what if that's, what if someone were to say that's just too speculative? What else do you have that would put him in the deliberate indifferent box? Or do you think you need him to have kind of presumed awareness of the kites? Well, Your Honor, I think that, so there's, so I think there's two bases for, for, for knowing his, his awareness here. And so what the, you know, what the cases say is that for deliberate indifference that requires subjective awareness of this is a serious medical need and a failure to adequately respond. And so I think the kites that I've just been talking about would be one basis. But I think another independent basis would be the fact that he, you know, that he, that he saw him in March and that he was the one who noted, you know, this patient has a badly decayed tooth, that he needs further work. So that, I mean, that's, that's about as clear of notice as How is that deliberate indifference? I mean, that's like recognizing that he needs further work. That seems like the opposite of deliberate indifference. Well, it's recognizing that he needs further work, Your Honor, but then this is, this is a doctor who's heading the dental department and who throughout this period then, you know, is, is, is knowing that, or is, is, is aware that he needs further work, but then Mr. Lewis isn't receiving it for a course of months. What kind of discovery happened below? I mean, I know your client was pro se. Was there anything? Was there interrogatories? Was, was anything done?  With, with respect to what, Your Honor? Discovery. What happened in discovery below, if anything? So there were, yeah, there, there, there were interrogatories that were served. Interrogatories is, is part of how it was established that Dr. Castellan was one of the doctors that was present during this time period, Your Honor. And so I think, I think that's probably the most specific evidence on that. And, and then as to, I just want to get around, you know, to your question about Avila and Rodriguez-Nicholson, because we've been talking a lot here about Dr. Castellan. So, so I, I mean, with, with respect to them, you know, it's undisputed that they were ones reviewing and responding to these kites throughout this period. And I think under this Court's decisions, in Hunt and Najet, that's really a pretty straightforward case for, for allowing this case to proceed against those two, Your Honor. So in the Hunt case, you had Mr. Hunt submitted written requests. I don't know if they called them kites in that case, but submitted written requests. And you had non-doctor prison officials that merely responded, you've been referred to dental care. And that's all that the response, that was the only response that we had in the Hunt case. And the Court actually reversed a grant of summary judgment as to those defendants and said that that was enough, you know, coupled with the three-month delay in treatment for, for a serious medical need. But that was enough to allow the claims to proceed against the dental assistants. You know, and then in the, in the Jett case, again, just, I know I referred to it with respect to the doctor, but with respect to the, to the medical assistants, that was a case where you had written requests for treatment. You had the, the plaintiff had sent letters. And again, there, the defendants actually denied that they'd even received those. But the Court nonetheless reversed, this Court reversed a grant of summary judgment as to those defendants and said, you know, we think that you can infer knowledge and deliberate indifference when you couple the, you know, they said we think it's a reasonable inference draw that they received it and were thus aware of the serious medical need. And I think it's really quite similar here with Avila and Rodriguez-Nicholson, Your Honor, that they, you know, it's, it's unlike the Jett case. It's undisputed here that they received those, that they, you know, responded to these kites, that they, you know, knew of his need for treatment based on that, Your Honor. And so then you take that, and then you look at there was this three-and-a-half-month delay, which is the type of delay that, that has been, you know, long enough in cases like Hunt to give rise to a deliberate indifference claim. I think that's enough for this case to proceed to a fact finder. What about Gutierrez? Are you conceding that Gutierrez really should be out? Yes, Your Honor. We, we, we don't, we don't contest a liability as to Gutierrez in this appeal, Your Honor. That's, that's correct. So if I, I mean, just, just to talk about, you know, the, the qualified immunity, the clearly established portion here, and I, I guess I'll get back to COVID and, and what I was talking about there, about how, about separating out the undisputed facts from the disputed facts. And I think what's really important here, if you look at cases like Marsh and cases like Peck from this, from this Court, Your Honors, what they say is that the, the proper way to conduct this analysis is to first to resolve all factual disputes in the nonmoving party's favor, and then to draw reasonable inferences in that party's favor, and then, based on those facts, to determine whether there was a violation of clearly, of clearly established law. And so I think here, if you, if you do that, what, what, what you're left with is a factual situation in which Mr. Lewis, you know, was seen at the beginning of, before the delay in March. He was told that he needed treatment. He was told, he was told that he should come back for, that he needs further work. That during this delay, he was submitting kites saying, my doctor told me I need to come back. And then you, but you nonetheless, you know, you have Avila and Rodriguez-Nicholson reviewing these kites, but you nonetheless have a delay of three and a half months. Well, I think on that set of facts, Hunt's directly on point, Your Honor. There, in that case, you had a, you had a similar dental need. There, they described it as a broken tooth. You had similar requests for treatment. There, you know, it was these written requests where they said, you've been referred to dental care. You had a similar length of time. There's three, a three-month delay. And so, and so Hunt, I think, clearly establishes each element of the claim here, Your Honor, such that it's appropriate to affirm the district court and deny qualified immunity. I see that my time's almost up, but, but unless the Court has any further questions, I'll. Robertson. Okay. Thank you, Mr. Schneider. Schneider. Thank you. Okay. Rebuttal. Mr. Davis. Thank you, Your Honor. I want to address a few things just briefly at the beginning. The thing about the same handwriting, I mean, first of all, I, my dad was a dentist, you know, and, and when he did these things, you know, he never wrote his own notes. The person, the dental assistant was there. He's busy with the person's people, with their hands and their mouth. He's, he's telling the dental assistant to do so. It's just sheer speculation that the, that the, that the, that it was written by a dentist. And then even, you know, and then even more speculation because we're not handwriting afterwards here. I want to also talk a little bit about Jett. Jett, it's clearly any, any indication that, that, that, that grievances can provide notices has been overruled by Peralta. Peralta specifically said, said, hey, this inmate's complaint can't do it. I want to go down onto the qualified immunity because in Carly, this court determined that merely relying on the holding that prison officials, doctors were deliberately different when they failed to provide or delayed providing necessary medical treatment defines the right too broadly in light of this court's procedures that requires the court to only look at the law in light of specific context case, not as a general proposition. Lewis therefore cannot be relied upon. There is no COVID pandemic going on in Lewis. There is no, there, here we have the, the, the, the, he offered to give it, to extract the tooth, which would have taken care of this problem, but he refused to do so because he had a difference of opinion with what could be done. And the dentist could not do it because hand pieces, dental drills could not have even been used at that time. He could not have filled that cavity. He couldn't have done anything other than what he did. Therefore, Lewis cannot be the, this, Lewis does not dispute that courts which subsequently considered the issue have ultimately, have repeatedly agreed that dental care in the, in the COVID pandemic, that this is the discretionary decisions and these other cases cannot possibly be clearly established law. And I would, the, the Friot case and the, in this court and the pen, what is it? The Panabreaker case in the third circuit, which is directly on point, which they totally ignored in their oral arguments. No court has held that a dental assistant who did not participate in general treatment could be deliberately different when they had no control in a, in a global pandemic situation as this, who never read any medical records, who was never present to say things. No court has held that a difference of opinion, which is all we have here, Your Honor, we have his difference of opinion. There is no expert, no other dentist is opined that the treatment provided by Dr. Castillo was medically unacceptable in those circumstances, and he did it in conscious disregard to his safety and health. He didn't do it in conscious disregard. He did it because he did it under the constraints that was available and the constraints of not allowing his tooth to be extracted, Your Honor. Lewis, therefore, cannot establish a constitutional violation, much less meet his burden of showing a violation of clearly established law beyond debate. Accordingly, defendants are entitled to qualified immunity, and this court should therefore reverse the district court's order and deny defendants' motion and grant defendants' motion for summary judgment. Thanks, Your Honor. Thank you. Thank you both for your helpful presentations. This case is submitted.
judges: THOMAS, BRESS, MENDOZA